IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-40720
_____


FLOUR BLUFF INDEPENDENT SCHOOL DISTRICT,

                              Plaintiff-Appellant,

                    versus

KATHERINE M. BY NEXT FRIEND LESA T.,

                              Defendant-Appellee.

_____

Appeal from the United States District Court for
the Southern District of Texas
_____

July 30, 1996

Before REAVLEY, GARWOOD and DeMOSS, Circuit Judges.

REAVLEY, Circuit Judge:

     The Flour Bluff Independent School District (Flour Bluff)
appeals a district court's placement decision of Katherine M.
(Katie), a hearing impaired student.  The district court
determined that Katie's 1994-95 Individual Educational Plan (IEP)
was not based upon her individual needs, and that her IEP
violated the least restrictive environment provisions of the
Individuals with Disabilities Education Act (IDEA).[1]  We reverse
the judgment because the district court misconceived the
proximity factor in Katie's placement decision.

_____

     [1]     20 U.S.C. § 1400, et. seq.

I. IDEA

The Individuals with Disabilities Education Act requires states to provide disabled children with a "free appropriate public education" in return for acceptance of federal funds.[2] The student's curriculum is uniquely tailored to the individual student through the annual implementation of an "individualized education program" or "IEP."[3]  The IEP is produced by a qualified representative of the local education agency, the child's teacher, the child's parents or guardian, other individuals at the discretion of the agency or the parent, and where appropriate, the child.[4]  In Texas, this is called the Admission, Review and Dismissal (ARD) committee.[5]  In part, Congress defined the IEP as follows:

> The term 'individualized education program' means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and whenever appropriate, such child, which statement shall include --
>     (A) a statement of the present levels of educational performance of such child,
>     (B) a statement of annual goals, including short-term instructional objectives,
>     (C) a statement of the specific educational services to provided to such child, and the extent to which such

---

[2]     20 U.S.C. § 1412.

[3]     20 U.S.C. § 1412(4); 34 C.F.R. §§ 300.340-300.350.

[4]     34 C.F.R. §300.344.

[5]     Tex. Educ. Code § 29.301(1) (effective May 30, 1995).

> child will be able to participate in regular educational programs,
>
> *       *       *
>
> (E) the projected date for initiation and anticipated duration of such services, and
>
> (F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
>
> In the case where a participating agency, other than the educational agency, fails to provide agreed upon services, the educational agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives.[6]

Once a child's educational program is determined, the local school district must then attempt to place the student in the "Least Restrictive Environment" or "LRE."[7]  For example, one of the main concerns of Congress is that the state attempt, as best it can, to mainstream the child, that is, educate the disabled child among non-disabled children.[8]  Further, the public agency shall ensure that,

> (a) The educational placement of each child with a disability--
>> (1) Is determined at least annually;
>> (2) Is based on his or her IEP; and
>> (3) Is as close as possible to the child's home.
>
> *       *       *
>
> (c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled.
>
> (d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs.[9]

---

[6]     20 U.S.C. § 1401(20).

[7]     20 U.S.C. § 1412(5); 34 C.F.R. § 300.550-300.556.

[8]     20 U.S.C. § 1412(5)(B).

[9]     34 C.F.R. § 300.552.

3

II. Katie and her IEP

Katie, a deaf student, resides on the northern end of Padre Island in the Flour Bluff Independent School District. Texas has a system of regional day schools for students with disabilities.[10] They are located at sites throughout the state and draw students from the surrounding communities. Katie began to attend the state's regional day school located in the neighboring Corpus Christi Independent School District at the age of 18 months. The regional day school has facilities attached to an elementary, middle and high school in the Corpus Christi Independent School District. The regional day school for elementary students is associated with Calk Elementary. This enables the day school to provide disabled students with a wide variety of services, ranging from completely independent classes to support services for students in mainstreamed classes.

The Admission, Review and Dismissal committee, named by the Flour Bluff district, decided Katie's IEP for the 1994-95 school year in April of 1994. The IEP provided for placement in mainstream classes with an interpreter and additional assistance for speech therapy, audiological management services, and a deaf education teacher. By two months into her third grade year (the 1994-95 school year), Katie was receiving only support services from the day school and attending fully mainstreamed classes at

---

[10] See Tex. Educ. Code § 30.081 et. seq. (effective May 30, 1995). Similar provisions for regional day schools were formerly governed by Tex. Educ. Code § 11.10.

4

Calk Elementary with the assistance of a sign interpreter.[11]  In addition to her regular classes at Calk, Katie was seen 90 minutes per week with a day school speech pathologist and 60 minutes per week with the Corpus Christi Independent School District speech pathologist.  During her attendance at Calk, she was a straight-A honor roll student.

In December of 1994, Katie's mother requested that Katie be transferred to the school she would otherwise attend in Flour Bluff.  Calk Elementary and Flour Bluff are approximately 16 and 9 miles, respectively, from Katie's home.  The ARD committee determined that it would not change Katie's placement unless the transfer would bestow a greater benefit upon her.  The committee identified four factors for this determination.  They included:

> (1) the comprehensiveness of the Regional Day School Program;
>
> (2) unlike Flour Bluff elementary, which has no deaf students, the Regional Day School Program offers Katie the opportunity for relationships with non-hearing as well as hearing peers;
>
> (3) the Regional Day School Program offers Katie the opportunity to use different interpreters; and
>
> (4) a placement at Flour Bluff Elementary would not provide Katie an educational benefit superior to the benefit she receives from the Regional Day School Program.

Under the regulations governing IDEA, Katie sought review of the ARD decision by a state agency hearing officer.[12]  These regulations provide for a due process hearing where the district

---

[11]    At the request of Katie's mother, the ARD agreed to no longer require services of a deaf education teacher.

[12]    20 U.S.C. § 1415(b)(2); 34 C.F.R. § 300.506(a).

refuses, among other things, to change the educational placement of a child.[13]  The hearing officer determined that Katie's IEP was not based upon her individual needs in that the "ARD failed to consider placing Katie at the school as close as possible to her home."  As a part of her analysis, the hearing officer determined that "[c]onsidering the prominent placement in the federal regulations of the close-to-home provisions, . . . [that factor] is to be accorded significant weight."  The hearing officer granted Katie's request for a transfer to Flour Bluff.

Flour Bluff filed a civil action in district court for review of the hearing officer's decision.[14]  The district court found that the ARD violated the procedural requirements of IDEA by not considering Katie's individual needs when devising her IEP.  Further, the court found that the evidence from the trial "shows that the ARD committee focussed on whether Flour Bluff could offer a program superior to the Regional Day School, rather than addressing Katie's individual needs."  The court indicated that Flour Bluff's evidence concerning the cost of the transfer was minimal, only impacting the school supply funds.  Finally, the court found that the school district failed to consider placing Katie close to home, as required by IDEA.[15]  Therefore, the IEP was not based upon her individual needs.  The court ordered that she be transferred to Flour Bluff, and that Flour

---

[13]    34 C.F.R. §§ 300.504 and 300.506.

[14]    20 U.S.C. § 1415; 34 C.F.R. § 300.511.

[15]    34 C.F.R. § 300.552.

Bluff hire an interpreter and contract out for Katie's remaining services.  Flour Bluff appeals.

III. Discussion

"The district court's decision that an IEP fulfills the requirements of IDEA is a mixed question of fact and law and, as such, we subject this determination to a de novo review."[16]  We are mindful, however, of our appropriate role in this regard.

> Congress left the choice of educational policies and methods where it properly belongs--in the hands of state and local school officials.  Our task is not to second guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act.[17]

We defer to the district court's underlying factual findings, unless they are clearly erroneous.[18]

We begin with two important clarifications.  First, this case does not raise the question of whether or not Katie should be mainstreamed.  The regional day school Katie attended was attached to Calk Elementary and provided for fully mainstreamed classes when appropriate. Therefore, Katie's reliance on Daniel

---

[16]    Salley v. St. Tammany Parish School Bd., 57 F.3d 458, 462 (5th Cir. 1995); Christopher M. v. Corpus Christi Indep. Sch. Dist., 933 F.2d 1285, 1289 (5th Cir. 1991).

[17]    Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1048 (5th Cir. 1989).

[18]    Salley, 57 F.3d at 463; Christopher M., 933 F.2d at 1289.

R.R. v. State Bd. of Educ., 874 F.2d 1036, 1039 (5th Cir. 1989), and other cases concerning mainstreaming are not controlling.

Second, the IEP governs the services a child is to be provided and following that determination, the placement of the student is governed by the Least Restrictive Environment analysis. These are two separate inquiries. In Katie's case the decision was made by the same ARD committee, but that does not necessarily have to be the case. The IEP is developed, reviewed and revised through a meeting or a series of meetings which includes a special education representative of the public agency (other than the teacher), the child's teacher, one or both of a child's parents, and the child if appropriate.[19] The placement decision of a child is "made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options" who also ensure that placement decision is made in conformity with the rules governing the LRE.[20] We do not intend to indicate that a school must have two separate committees to determine the IEP and placement of a student, only that a district could do so. Our focus today concerns the separateness of the IEP and placement decisions, and the fact that the regulations contemplate that those decisions may be made by different groups reflects their separation.

State agencies are afforded much discretion in determining which school a student is to attend. Under the regulations

---

[19]     34 C.F.R. § 300.344.

[20]     34 C.F.R. § 300.533(a)(3)-(4).

8

governing the placement of a student in the "Least Restrictive Environment," a child should attend his or her neighborhood school <u>unless</u> the child's IEP requires arrangements that do not exist at that school.[21]  In fact, if the child requires such arrangements, the school district has numerous options (public or private) on placing the student.[22]  The regulations, not the statute, provide only that the child be educated "as close as possible to the child's home."  However, this is merely one of many factors for the district to take into account in determining the student's proper placement.[23]  It must be emphasized that the proximity preference or factor is not a presumption that a disabled student attend his or her neighborhood school.[24]

---

[21]     34 C.F.R. § 552(c).

[22]     In Appendix C of Part 300 of the Regulations entitled "Notice of Interpretation," the commissioner answered the question of whether a "public agency itself [must] provide the services set out in the IEP" as follows:
> The public agency responsible for the education of a child with a disability could provide IEP services to the child (1) directly, through the agency's own staff resources, or (2) indirectly, by contracting with another public or private agency, or though other arrangements.  In providing the services, the agency may use whatever State, local, Federal, and private sources of support are available for those purposes. . . .

32 C.F.R. Pt. 300, App. C, question 46.

[23]     <u>Barnett v. Fairfax County School Bd.</u>, 927 F.2d 146, 153 (4th Cir.), <u>cert.</u> <u>denied</u>, 112 S.Ct. 175 (1991); <u>Murray by and through Murray v. Montrose County School Dist.</u>, 51 F.3d 921, 929 (10th Cir.), <u>cert.</u> <u>denied</u>, 116 S.Ct. 278 (1995).

[24]     <u>Murray</u>, 51 F.3d at 930; <u>but</u> <u>see</u> <u>Oberti v. Board of Educ.</u>, 995 F.2d 1204, 1224 n.30 (3d Cir. 1993).

IDEA expressly authorizes school districts to utilize regional day schools such as the one at issue here,[25] and we think the importance of these regional programs is obvious. Undoubtedly there are a limited number of interpreters, speech pathologists with backgrounds in deaf education, and deaf education teachers; and, by allocating these limited resources to regional programs, the state is better able to provide for its disabled children. Additionally, by placing these educators at regional centers, those centers are better able to provide further training for those educators and make substitutions for absent educators.

Of the 400 to 500 students enrolled at Calk Elementary there are approximately 32 students attending the regional day school. In Katie's mainstreamed class there was one other fully mainstreamed deaf student, and one other part-time mainstreamed student. The regional day school provided the interpreters, speech therapists, and other support services for the deaf students at Calk.[26]

There were approximately 15 sign interpreters in the regional day school assigned to the elementary, middle and high schools associated with the regional program within the Corpus Christi Independent School System. Of those 15, only 10 were

---

[25]    20 U.S.C. § 1414(d).

[26]    There was also evidence that Katie required the use of a hearing device called a "phonic ear." The evidence indicates some maintenance services for this device may have been provided by the regional day school.

10

certified.  The day school had obtained a waiver from the Texas Education Agency for the remaining five.  In the year prior to the onset of this litigation, the regional day school had received only five applicants for four openings at the school. There was testimony that this was fairly representative of the supply of interpreters for the day school.  In fact, the regional day school could only meet its demand by hiring uncertified interpreters.

Katie's mother, who was the lead interpreter at the regional day school, testified concerning the procedures implemented in staffing interpreters at the regional day school.[27]  Because of the short supply of interpreters, substitutions were difficult when interpreters were ill or otherwise unavailable.  The regional day school provided a mentoring program and staff development programs for their interpreters.  The interpreters' proficiency levels were increased through the school's extensive evaluation system.  The more proficient interpreters were allocated to the advanced grades because of the increased complexity of the subjects.

The evidence showed that the supply of speech pathologists was equally low.  At the regional day school at Calk Elementary, both of the two speech pathologists had experience in deaf education, but this was unusual.  Often the regional day school was without speech pathologists with that experience.  In fact,

---

[27]    In October of 1994, Katie's mother started her own interpreter business.  After that date she remained a contract employee with the regional day school on a part-time basis.

it was very difficult to hire a speech pathologist even without experience in deaf education. The superintendent of Flour Bluff testified that in September of 1994 the district began advertising for two speech therapists. In April or May of the next year they finally received four applicants, none of whom had more than a bachelor's degree. The district was forced to hire two of those four.

The rationale for creating a regional day school can also be seen by examining Katie's third grade class. If all three students were to attend different schools, each district would be required to hire an additional interpreter from the already low supply. The scarcity of resources would be worsened if each child in the various grades attending the regional school were to return to his or her home district. We believe that the decision to create the regional day schools is a sound policy decision that was intended to be left to the state.

Distance remains a consideration in determining the least restrictive environment. The regulations say that it is. The child may have to travel farther, however, to obtain better services. And in this case, distance is not controlling -- from Katie's home to the Flour Bluff school is approximately 9 miles, from her home to Calk Elementary it is 17 miles.

Flour Bluff School District was free to utilize the regional day school for its disabled students. Educating Katie "close to home" was only a factor for the school district to consider when determining her placement in the Least Restrictive Environment;

12

and with the proximity of the regional day school to Katie's home, that factor was not controlling.

The district court erred in relying upon the hearing officer's conclusion that Flour Bluff did not "think carefully and seriously" about placing Katie in her neighborhood school. The hearing officer's conclusion was based upon her interpretation of the regulations that the "close to home" provision should be "accorded significant weight." While it is not clear that the district court similarly interpreted the regulations, the district court did presume incorrectly that her neighborhood school was the proper placement even though Katie required other arrangements which were not then in existence at Flour Bluff. Nor did the district court apparently afford any weight to the testimony of Flour Bluff officials concerning the scarcity of educational resources upon which the district had grounded its policy decision to send disabled students who required certain services to the regional day school.[28] Rather, the court focused simply upon the costs of implementing the individual program instead of upon <u>both</u> the financial <u>and</u> <u>resource</u> costs of duplicating the programs. Therefore, because we read the district court's judgment to impose proximity as a presumptive factor in the placement decision and because the district court failed to consider Flour Bluff's policy

---

[28] See <u>Barnett</u>, 927 F.2d at 152 ("Whether a particular service or method can feasibly be provided in a specific special education setting is an administrative determination that state and local school officials are far better qualified and situated than are we to make.")

13

consideration in sending Katie to the regional day school, we reverse that judgment.

IV. Conclusion

During oral arguments, we learned that Katie had been transferred to Flour Bluff to comply with prior orders in the case. Under IDEA's "stay-put" provisions, Katie should have remained at Calk Elementary during the pendency of this litigation, unless the move was agreed upon by the district and Katie's mother.[29] One of the obvious purposes of the "stay-put" provision is to reduce the chance of a child being bounced from one school to another, only to have the location changed again by an appellate court.

We remand this case to the district court, although the proceedings there may require nothing more than dismissal. The IEP for Katie for the forthcoming year will soon be completed and, consistent with this opinion, the ARD committee should consider the fact that Katie is currently attending Flour Bluff and that Flour Bluff may now have the support services she requires.

REVERSED and REMANDED.

---

[29] 20 U.S.C. § 1415(e)(3); 34 C.F.R. § 300.513(a).