choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child."). In this case, numerous school officials testified that the categorical classroom placement was necessary based on Emma's goals and needs and based on a comparison of the teaching methodologies. We need not detail that evidence here, because there is no dispute about the facts that support the experts' testimony. It is sufficient to note that, giving the appropriate deference to the findings of the administrative hearing officers, the plaintiffs did not meet their burden of proving that the 1999 IEP plan was inappropriate for Emma.

## *CONCLUSION*

In overturning the decisions of the administrative hearing officers, the district court managed to re-focus this case entirely. From the outset, the parties had agreed that Emma would be fully included in the half-day mainstream kindergarten class, and they also agreed that Emma needed a full-day program. The disagreement centered on what type of special education classroom was appropriate for the second part of Emma's day. Because the Holt school system has certain types of special education classrooms at certain elementary schools, the decision about the type of classroom would necessarily determine which elementary school Emma would attend. The McLaughlins wanted Emma to attend Dimondale and have gone to great effort to contend that the resource room at Dimondale could be adapted to serve Emma's goals and needs. However, the hearing officers decided, and an independent review of the record reveals, that a categorical classroom is best designed to serve the needs of students like Emma. In the end, the plaintiffs have failed to meet their burden of demonstrating that a categorical classroom is an inappropriate placement.

It follows that the judgment of the district court must be REVERSED and the case REMANDED for entry of an order sustaining the decision of the state hearing review officer.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0060P (6th Cir.)
File Name: 03a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| CARL and MARY SUE MCLAUGHLIN, individually and on behalf of their daughter, EMMA MCLAUGHLIN, a minor,<br>　　　*Plaintiffs-Appellees,*<br><br>v.<br><br>HOLT PUBLIC SCHOOLS BOARD OF EDUCATION; TOM DAVIS, Superintendent; and TOM WEST, Director of Special Education,<br>　　　*Defendants-Appellants.* | No. 01-1521 |

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 00-00069—David W. McKeague, District Judge.

Argued: November 1, 2002

Decided and Filed: February 24, 2003

Before:  SILER and DAUGHTREY, Circuit Judges;
         ALDRICH, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  James S. Jamo, GRUA, JAMO & YOUNG, Lansing, Michigan, for Appellants.  Myra S. Dutton-Johnson, N. Muskegon, Michigan, for Appellees.  **ON BRIEF:** James S. Jamo, GRUA, JAMO & YOUNG, Lansing, Michigan, Michael L. Bevins, LAPOINTE & ASSOCIATES, Okemos, Michigan, for Appellants.  Myra S. Dutton-Johnson, N. Muskegon, Michigan, Jason D. Kolkema, JOHNSON, ROSATI, LaBARGE, ASELTYNE & FIELD, Lansing, Michigan, for Appellees.

_____

**OPINION**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge.  The plaintiffs, Carl and Mary Sue McLaughlin, filed suit in district court pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, seeking to overturn the order of a state hearing review officer in favor of the defendant school board in a dispute over the Individualized Education Program (IEP) for their daughter, Emma McLaughlin, that had been proposed by Holt Public Schools for the 1999-2000 school year.  The district court reversed the administrative ruling, holding that the school system must afford the child the appropriate educational program outlined in the IEP at the school in her neighborhood rather than the facility some distance from her home that was identified by the defendants as the most appropriate educational setting for a student with

_____

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

*Roncker* court, when "the dispute is simply one of methodology[,] . . . the Supreme Court has emphatically stated that such questions should be left to the states." *Id.* (citing *Rowley*, 458 U.S. at 206-07).  In *Roncker*, however, "the question [was] not one of methodology but rather involve[d] a determination of whether the school district ha[d] satisfied the Act's requirement that handicapped children be educated alongside non-handicapped children to the maximum extent appropriate." *Id.*[4]  This case presents an issue of methodology, not of the extent to which Emma should be mainstreamed.

Emma's parents had a due process hearing in which they had the burden of proving that the categorical classroom placement was inappropriate for Emma, but both the local hearing officer and state review hearing officer concluded that the preponderance of the evidence supported placing Emma in the categorical classroom.  The district court should have, and this court will, give due weight to such an administrative decision involving methodology and educational expertise.  *See Burilovich*, 208 F.3d at 567.

States and school districts should be afforded some discretion in determining what type of program is appropriate based on the individual needs of a disabled child.  *See id.* at 566 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for

_____

[4] *Roncker* set forth three factors for determining when the mainstreaming requirement may be overcome: (1) whether the disabled student would benefit from inclusion from general education, (2) whether such benefits would be outweighed by benefits that are not provided in an inclusive setting, and (3) whether the disabled child disrupts the general education setting.  *See* 700 F.2d at 1063.  The inapplicability of any of these three factors to the case at hand reinforces that this case is not about the least restrictive environment and the mainstreaming of Emma.  Under either plaintiffs' or defendants' preferred outcome, Emma  would be mainstreamed and fully included in the Holt general education kindergarten program.  As previously noted, the only question is where she will spend her special education portion of the school day.

In this case, the parties did not disagree about the extent to which Emma would be mainstreamed with non-disabled peers; she was to be fully included in the Holt half-day kindergarten program. Hence, the disputed issue did *not* involve determination of the least restrictive environment for Emma. Hence, the district court's reliance on that provision in the Act in order to grant summary judgment in the plaintiffs' favor was error.

### B. The Burden of Proof

Although the district court properly noted at one point in its opinion that the burden of proof rested on the plaintiffs to show that the IEP plan placing Emma in a categorical classroom was inappropriate, *see Dong*, 197 F.3d at 799, the court appeared to shift that burden to the defendants, holding that the school system had failed to demonstrate that Emma's needs could not be met at Dimondale Elementary. To get around the McLaughlins' failure to demonstrate the categorical classroom was inappropriate, the district court apparently decided that Emma's placement in the resource room would be a less restrictive alternative, and therefore a preferred placement to that of a categorical classroom. As noted above, however, there is no basis in the "least restrictive environment" provision for evaluating the "restrictiveness" of alternative special education placement options, all of which require separation from non-disabled peers.

The district court came to its conclusion by relying upon our opinion in *Roncker*, 700 F.2d at 1063, in which we discussed the mainstreaming requirement in the "least restrictive environment" provision. However, the court's reliance on *Roncker* was simply misplaced. *Roncker* distinguished two types of IDEA cases that can arise: those involving a decision between two alternative methods of educating a disabled student and those involving a decision about the extent to which a disabled child should be educated alongside a non-disabled child. *Id.* at 1062. According to the

Emma's particular needs. This placement, the district court ruled, constituted the "least restrictive environment" under the requirements of the Act.

Because we conclude that the district court's analysis of the "least restrictive environment" mandate was flawed, and because the court applied the incorrect burden of proof and failed to give due weight to the administrative decision on issues of educational policy, we find it necessary to reverse the judgment below.

### *FACTUAL AND PROCEDURAL BACKGROUND*

The Individuals with Disabilities Education Act provides federal funds to help states educate disabled students. *See* 20 U.S.C. § 1411. A state receiving funds under the Act is required to provide a "free appropriate public education... to all children with disabilities residing in the State." *Id.* at § 1412(a)(1). Under the Act, an Individualized Education Program must be developed for each child with a disability, including statements of (1) the child's present level of educational performance, (2) measurable annual goals, and (3) the special education and related services as well as supplementary aids and services that will be provided to the child. *Id.* at § 1414(d)(1)(A). The plan is developed by the IEP Team, which includes the child's parents, as well as regular and special education teachers and others. *Id.* at § 1414(d)(1)(B). The Act contains a requirement that the IEP for a disabled child educate that child in the "least restrictive environment":

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with

the use of supplementary aids and services cannot be achieved satisfactorily.

*Id.* at § 1412(a)(5).  Educational placement decisions are based on the IEP.

The Act also establishes procedural safeguards to ensure that children with disabilities and their parents can "present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  *Id.* at § 1415(b)(6).  Upon presenting such a complaint, the parents or guardians have the procedural right to an "impartial due process hearing" conducted by the appropriate state or local educational agency. *Id.* at § 1415(f).  In Michigan, there is a two-tier review system: a dispute is first presented to a local hearing officer, and if an aggrieved party chooses to appeal, to a state hearing review officer. *See* Michigan Administrative Code Rule 340.1724.  After the administrative appeals, an aggrieved party "shall have the right to bring a civil action with respect to the complaint presented" in the administrative review process.  20 U.S.C. § 1415(i)(2).

Emma McLaughlin was born on December 12, 1992, and diagnosed with a condition commonly known as Down Syndrome shortly thereafter.  Because of this condition, Emma is a "child with a disability" as defined in the Act, 20 U.S.C. § 1402(3); 34 C.F.R. § 300.7, and she has received special education services since she was two months old.  She lives with her parents in Dimondale, Michigan, and is currently eligible for special education services as a child who falls into the category of "educable mentally impaired."

Until June 1996, Emma's parents signed IEP plans in agreement with the school district's proposals each year. Since that time, however, the parties have had a series of disagreements about how to structure Emma's education. After the 1995-1996 school year, in which Emma attended a

of the requirement in the Act clearly commands schools to mainstream disabled children as much as possible, it is silent about where, within the school district, that mainstreaming should take place. *See Hudson by Hudson v. Bloomfield Hills Pub. Sch.*, 910 F. Supp. 1291, 1304 (E.D. Mich. 1995) (holding that nothing in the Act requires a school district to place a disabled child in the school that child would attend if not handicapped), *aff'd*, 108 F.3d 112 (6th Cir. 1997); *Murray By and Through Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 928-29 (10th Cir. 1995) (holding the statute's plain meaning does not include a presumption that the least restrictive environment is a neighborhood school).

The plaintiffs attempt to rely on the Act's implementing regulations, 34 C.F.R. §§ 300.550-300.554, to support their neighborhood school argument, but the implementing regulations also do not mandate placement in a neighborhood school as the least restrictive environment.  The regulations provide only that "[t]he educational placement of each child with a disability [shall be] as close as possible to the child's home," 34 C.F.R. § 300.552(a)(3), and that "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." 34 C.F.R. § 300.552(c).  As we concluded in *Hudson*, we reiterate that these two regulations should be read, as their plain language indicates, to provide that a child should be educated in the neighborhood school (the school he or she would attend if not disabled) except when the goals of the child's IEP plan require a special education placement not available at that school, and in a situation when placement elsewhere is required, the geographic proximity of schools that offer that placement to the child's home should be considered. *See Hudson*, 910 F. Supp. at 1304; *accord Flour Bluff Indep. Sch. Dist. v. Katherine M. by Lesa T.*, 91 F.3d 689, 693 -94 (5th Cir. 1996) (emphasizing that the consideration of proximity is not a presumption that a disabled student attend his or her neighborhood school); *Murray*, 51 F.3d at 929; *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 153 (4th Cir.1991).

the appropriate type of classroom placement to the appropriate school placement. The court conceded that it was re-framing the issue, explaining that the administrative hearing officers had failed to consider the "least restrictive environment" mandate. It appears to us, however, that the administrative officers did not overlook that requirement but properly found that it was not relevant to the issue in dispute. We further conclude that the district court misinterpreted the Act's "least restrictive environment" mandate, misapplied it to Emma's 1999 IEP plan and, in doing so, improperly shifted the burden of proof from her parents to the school system.

### A. Inapplicability of IDEA's Least Restrictive Environment Requirement

The district court may have gotten off track early, by beginning its analysis based on the incorrect premise that at the administrative hearings "both sides agreed, in the abstract, that Dimondale Elementary represented the least restrictive environment." In fact, as noted above, the local hearing officer determined that the issue of least restrictive environment was not relevant because the parties had agreed about the extent to which Emma would be in a general education classroom. The least restrictive environment analysis is relevant when there is a question of mainstreaming; generally – it does not address the question of mainstreaming at a particular school. The district court's assumption that the Act includes a directive that, in the abstract, a child's neighborhood school is the least restrictive environment for that child is simply erroneous. There is no such requirement either in the text of the Act or in the implementing regulations.

Instead, the requirement that the school system provide a disabled child with the least restrictive environment is a mandate favoring mainstreaming, that is, the education of disabled children alongside non-disabled children to the maximum extent appropriate for the individual child. *See, e.g., Roncker*, 700 F.2d at 1062. Although the plain language

pre-primary special education classroom operated by Holt Public Schools, her parents refused to continue classroom services through Holt, and they chose to enroll Emma for the 1996-1997 school year in the Michigan State University's Child Development Lab School at their own expense. The Holt School District continued to provide ancillary and related services. The McLaughlins re-enrolled Emma at the Lab School during the 1997-1998 school year, again with the Holt School District providing certain ancillary and related services.

In May 1998, Emma's parents disagreed with the plan proposed for the 1998-1999 school year and requested a hearing. While the hearing was pending, a three-year reevaluation was due at the same time as the next annual IEP. Hence, the hearing on the 1998 IEP was postponed to allow completion of those tasks, and it was agreed that any issues surrounding the 1998 IEP would be subsumed in any new hearing request after the reevaluation and the 1999 IEP (for the 1999-2000 school year) were completed. The IEP Team meeting was held on April 21 and 23, 1999, and a plan was developed that provided various goals and objectives for Emma. Everyone attending the meeting agreed Emma would fully participate in the general education kindergarten setting, which was a half-day program, with paraprofessional support. It was also agreed that Emma would need a full day program, meaning she would receive special education classroom support during the other half day. The parties disagreed as to what type of classroom was appropriate for Emma: a categorical classroom or a resource room.[1]

---

[1] At the time of the 1999 IEP, a categorical classroom, or basic classroom, was designed to address the needs of students within particular disability categories. In this case, the categorical classroom available was a Trainably Mentally Impaired (TMI) categorical classroom governed by Michigan Administrative Code Rule 340.1739 (1980). At the time of the 1999 IEP, a resource room was another special education setting. In it, a teacher could provide instruction to a student in a limited number of curricular areas, and it was designed for students who needed less than

The school officials on the IEP Team determined that a categorical classroom was necessary to meet Emma's individual goals and education needs. Because Emma's parents disagreed with that determination, they filed a dissenting report to the 1999 IEP indicating that they felt Emma's special education needs could be met in a resource room rather than a categorical classroom. They noted in the dissenting report that Emma qualified for the resource room because her needs did not require more than half of her instructional day in special education, which was the cutoff for allowing the delivery of special education services through a resource room. *See* Michigan Administrative Code Rule 340.1749a (1987). The primary reason for their disagreement with the categorical classroom placement was that the categorical classroom placement required Emma to attend Sycamore Elementary School rather than Dimondale Elementary School, her "neighborhood school."

The Holt Public School District operates six elementary schools, including Dimondale Elementary and Sycamore Elementary, the two schools at issue in this case. Dimondale Elementary was the closest school to Emma's house – and the one she would have attended if not disabled. Sycamore Elementary was 7.3 miles further away from her house. Dimondale Elementary has a resource room but not a categorical classroom; therefore, to receive special education services in a categorical classroom, Emma would have had to attend Sycamore Elementary.

---

fifty percent of their day in a special education classroom. *See* Michigan Administrative Code Rule 340.1749a (1987). Both of these rules were amended, effective June 6, 2002. A TMI categorical classroom is now called a program for students with moderate cognitive impairment, but is subject to the same rules as before. *See* Michigan Administrative Code Rule 340.1739 (2002). Eligibility for a resource room is no longer limited to those students needing fifty percent or less of their instructional school day in special education. *See* Michigan Administrative Code Rule 340.1749a (2002). However, the parties have always agreed that Emma did not require more than 50 percent of her time in a special education setting.

hearing officer found the preponderance of the evidence supported Emma's placement in the categorical classroom as necessary to meet her IEP goals and objectives.

On appeal to the state hearing review officer, the McLaughlins argued that the local hearing officer erred in determining that the categorical classroom was the appropriate delivery method for Emma's special education services. They believed that because the resource room was not inappropriate and because it was located at Dimondale Elementary, Emma's neighborhood school, the "least restrictive environment" requirement mandated Emma's placement in that classroom. The state hearing review officer found the parents had the burden of proving that placing Emma in a half-day categorical classroom was inappropriate. Like the original hearing officer, he rejected the McLaughlin's claim that the Act's "least restrictive environment" provision required Emma be placed at her "home school" of Dimondale Elementary. Instead, he noted that a child with a disability should be educated in the school he or she would attend if non-disabled *except* when the child's IEP required placement elsewhere. He therefore concluded that Emma's IEP plan required placement elsewhere because the preponderance of the evidence in the case supported her placement in a categorical classroom, which was not available at Dimondale, the elementary school she would attend if non-disabled.

At their inception, the due process hearings at the administrative levels were solely about which of the two classroom settings was appropriate, and, at least initially, the district court judge recognized this fact, announcing at the bench trial that "[t]he issue here is not the goals and objectives because the parents and the school district are in agreement. The issue is whether the placement or program, whichever is the appropriate word in this field, was appropriate in light of how to best achieve those goals and objectives in the least restrictive environment." In its written opinion, however, the district court changed the issue from

The local hearing officer recognized that the "least restrictive environment" question involved the issue of "mainstreaming" Emma in a general education classroom for part of the school day and *not* the determination of which special education classroom was appropriate for the remainder of the child's school day. As he put it, "[E]vidence relating to Emma being placed at her neighborhood school [is] not relevant. . . [because] the issue is not one of [least restrictive environment] but rather *which special education classroom setting* is appropriate to address Emma's individual needs."[3]

After hearing testimony from, among others, a Holt general education kindergarten teacher, a Holt resource room teacher, a Holt categorical classroom teacher, Holt's Director of Special Education, a speech and language pathologist, a special education resource room teacher in the Lansing school district, and Emma's teacher at the Lab School, the local

---

Dimondale Elementary, and no other school. Indeed, our reading of the record suggests -- and the statements by counsel at oral argument of this case tended to confirm – that if a categorical classroom had been available at Dimondale, the parents would not have objected to the appropriateness of a categorical classroom placement. The only basis for their objection to the 1999 plan was their preference for Dimondale Elementary, which could only be accommodated if a resource room were determined to be the appropriate for Emma's special education services. At argument, counsel spoke in terms of Mary Sue McLaughlin's wish to be able to "go down the street and enroll her daughter in the neighborhood school like everyone else" in the area. It is well-established, however, that there is no absolute right to attend a neighborhood school. *See Murray By and Through Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 928-29 (10th Cir. 1995); *Schuldt v. Mankato Indep. Sch. Dist. No. 77*, 937 F.2d 1357, 1361 (8th Cir. 1991); *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 153 (4th Cir.1991).

[3] Emphasis in the original transcript. Before the hearing commenced, the parents acknowledged that if the hearing officer decided that a categorical classroom was the special education classroom necessary to meet Emma's needs, they were not demanding to have that classroom duplicated at Dimondale Elementary.

In response to the McLaughlin's objection to Emma's placement, a local hearing officer held a due process hearing in July 1999 to determine which special education classroom setting was appropriate to address Emma's individual needs and found that the appropriate placement for Emma was the categorical classroom. Emma's parents appealed, and in September 1999, a state hearing review officer affirmed the local hearing officer's decision that Emma should participate in the categorical classroom instead of the resource room.

Subsequent to that decision, the McLaughlins filed the current action in federal district court and, ultimately, received a ruling in their favor. It is from that judgment that the current appeal by the school system arises.

### DISCUSSION

#### I.   Standards of Review

##### A.   In the District Court

In actions filed pursuant to the IDEA, there are two parts to a court's inquiry. First, the district court must determine whether the state has complied with the procedural requirements of the Act. *See Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Second, the court must decide whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits. *See id.* at 206-07. The Act requires states to provide a "free appropriate public education" to all children who are disabled and in need of special education. 20 U.S.C. § 1412(a)(1)(A). Michigan has added to this standard a requirement that the educational plan must be designed to develop the "maximum potential" of a child. Mich. Comp. Laws Ann. §§ 380.170(a), 380.1711(17)(a), 380.1751(1); *see also Burilovich v. Board of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000) (incorporating the Michigan "maximum potential" standard into the Act). It is clearly established that the McLaughlins bear the burden of proving by a preponderance

of the evidence that the IEP devised by Holt Public Schools is inappropriate. *See Dong v. Board of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 799 (6th Cir. 1999) (listing cases); *Doe By and Through Doe v. Board of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 458 (6th Cir. 1993).

In an IDEA action, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence, but also should give "due weight" to the determinations made during the state administrative process. *See Rowley,* 458 U.S. at 206. The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation. More weight is due to an agency's determinations on matters for which educational expertise is relevant. *See Burilovich*, 208 F.3d at 567. Reviewing courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Doe*, 9 F.3d at 458 (quoting *Rowley*, 458 U.S. at 206).

This modified *de novo* standard of review applies to both procedural and substantive matters. *See Burilovich*, 208 F.3d at 565. "According to this 'modified' *de novo* standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001).

### B.  On Appeal

On appeal from the district court, we apply a "clearly erroneous" standard of review to the district court's findings of fact and a *de novo* standard of review to its conclusions of law. *See Knable*, 238 F. 3d at 764. We must also accord due deference to the state hearing review officer's decision. *See Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir. 1983).

### II.  The District Court's IDEA Analysis

In resolving the dispute over Emma McLaughlin's 1999 educational plan, the district court attempted to reconcile the Act's least restrictive environment requirement with Michigan's state law "maximum potential" requirement. In doing so, we conclude, the district court, in effect, mixed the proverbial apples and oranges and reached the wrong conclusion as a result.

From the onset of this case at the administrative level, the sole issue was whether Emma should receive special education services in a categorical classroom or in a resource room in order to achieve the goals in her IEP, goals that had been agreed upon by the school officials and Emma's parents. The local hearing officer limited the due process hearing to this discrete issue – which of the two options for delivery of special education was appropriate for Emma. As the local hearing officer repeatedly emphasized, the case before him did not present a neighborhood schools issue or a "least restrictive environment" issue. The McLaughlins and Holt were in agreement that Emma would be fully included, or "mainstreamed," in Holt's half-day kindergarten program. Thus, the sole issue for the administrative review involved her special education placement for the second half of the day.[2]

---

[2]What becomes apparent after a review of the record as a whole, including the transcript of the1999 IEP Team meeting and the exhibits and testimony given during the due process hearing, is that the McLaughlins had firmly decided that they wanted their daughter to attend