United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 4, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-40704
Summary Calendar

_____

LEWISVILLE INDEPENDENT SCHOOL DISTRICT,

Plaintiff - Appellee,

versus

CHARLES W., as next friend to Charles W. a minor child;
GAY W., as next friend to Charles W. a minor child,

Defendants - Appellants.

_____

Appeal from the United States District Court for the
Eastern District of Texas
(No. 4:01-CV-350)

_____

Before JONES, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

In this suit to contest an award of educational costs to the parents of a disabled

child, Appellants Charles W. and Gay W. ("the W's") appeal the district court's

determination that Appellee Lewisville Independent School District ("LISD") comported

_____

[*] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should
not be published and is not precedent except under the limited circumstances set forth
in 5th Cir. R. 47.5.4.

with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 (2000) ("IDEA"). We affirm the judgment of the district court.

## I. FACTS AND PROCEEDINGS

The W's are the parents of Charles W. ("Charles"), a minor formerly enrolled as a special-education student in LISD. Charles began attending LISD in the second grade. He had significant behavioral problems which were, at that time, attributed to Attention-Deficit Hyperactivity Disorder. In third grade, he was removed from mainstream classes and placed in a self-contained transition classroom, where he stayed through the end of fourth grade. At the beginning of fifth grade, Charles was given a Comprehensive Individual Assessment, as is required by the IDEA. This assessment showed that his intellectual functioning was in the superior to very superior range.

When Charles advanced to sixth grade, he was placed back in mainstream classes, including some advanced placement classes. To assist with his writing disability, Charles was provided with an Alpha Smart word processor. He was also given services related to his disability, including keyboarding instruction, occupational therapy consultations, and special education counseling.[1] The Admission, Review, and Dismissal Committee met in September of Charles's sixth grade year and discussed a Functional Behavioral

---

[1]Although the parties dispute the extent and efficacy of these services, they agree that services were provided.

2

Assessment for Charles and derived a Behavioral Intervention Plan from that assessment, all as required by the IDEA.[2]

Between sixth and seventh grades, Charles was evaluated for and diagnosed with an autism spectrum disorder, specifically Pervasive Developmental Disorder - Not Otherwise Specified ("PDD-NOS").[3] Charles was essentially a high-functioning autistic child.

Starting in seventh grade, the 2000-2001 school year, LISD implemented a new Individual Education Program ("IEP"), including a Behavior Intervention Plan, for Charles.[4] Charles was enrolled in mainstream classes, including advanced placement classes in reading and pre-advanced placement classes in math and science. He also participated in a social skills communication class with a special education teacher instead of physical therapy. This special communication class took place in a separate classroom

---

[2]The W's contend that there is no evidence that a Functional Behavioral Assessment was performed, merely the word of an LISD school psychologist, who did not provide the committee with a written copy of the assessment. The IDEA requires only that an Individualized Education Program ("IEP") be in written form. 20 U.S.C. § 1414(d) (2000).

[3]The parties contest whose idea it was to evaluate the initial diagnosis of Charles as a child with Attention-Deficit Hyperactivity Disorder. This contest is of no moment to the present case.

[4]The W's contend that there was no Functional Behavioral Assessment for Charles's seventh grade year; instead, there was a process of data-gathering which took place throughout the year, up until Charles's removal from LISD in February of 2001. Although there was no new Functional Behavioral Assessment for seventh grade, until one was implemented, Charles's sixth grade assessment and Behavioral Intervention Plan were continued.

in which Charles was the only student. Along with this new diagnosis of PDD-NOS, LISD provided a degree of training to its staff, teachers, and administrators on the nature of PDD-NOS.[5]

During the course of Charles's seventh grade year LISD also implemented a new form of reporting to the W's. The school provided social skills incident reports, which were used to document interventions made to address incidents due to Charles's disability and incidents attributed to non-disability behavior. To better assist Charles with his environmental sensitivities, LISD permitted Charles to leave class early, to avoid crowds and bells.[6] The classroom in which Charles attended his communications class was outfitted with indirect lighting and a trampoline for weight-bearing activities. Charles was allowed to go to the library during lunch, as it was quieter and less crowded. He was also provided head phones during pep rallies.

In January 2001, the W's informed LISD at a committee meeting that they were looking at placing Charles in a different school. The W's maintained that Charles was not improving, but was rather regressing with respect to his behavioral disability. LISD

[5]Again the W's contest this characterization as "training," since many of the teachers who were witnesses at the administrative hearing could not recall the exact nature of Charles's disability. It is of little importance that the training of an entire school system was not of the degree desired by the W's.

[6]Charles had sensitivity to noise and harsh lighting. The W's point out that permitting Charles to leave class only one minute early still placed him in the hallways with other children during the other three minutes between class changes. This does not affect the fact that he was given the privilege of leaving class early in order to address his disability, even though such privilege was not as extensive as possible to avoid all difficulties for Charles.

disagreed. The W's subsequently removed Charles and enrolled him in the Vanguard Preparatory School in Dallas, Texas, a school for disabled children. The W's point out that Charles has progressed nicely at the Vanguard School, has made friends his own age, makes better eye contact, and has had fewer behavioral incidents. They also emphasize that Vanguard's smaller classrooms, teaching staff, most of whom have a clinical or therapeutic background, and its handling of inappropriate behaviors have greatly benefitted Charles.[7]

The W's, as Charles's parents, filed a written request for a due process hearing with the Texas Education Agency on July 31, 2001. After the September 2001 hearing, the hearing officer concluded that LISD had failed to provide a free appropriate public education as mandated by the IDEA because Charles's IEP was not individualized, and was not administered in the least restrictive environment, and because positive academic and non-academic benefits were not demonstrated. The hearing officer required that LISD reimburse the W's for Charles's education at Vanguard until his graduation, as well as for the independent evaluation which resulted in the diagnosis of PDD-NOS.

LISD filed a complaint in district court, appealing the decision of the hearing officer. The magistrate recommended that the district court reverse the hearing officer's decision.

---

[7]LISD points out that the school has no advanced placement classes, and that students do not even attend class on Mondays. We find this irrelevant for purposes of the present appeal.

The district court adopted that recommendation, holding that a free public education as required by the IDEA had been provided to Charles. The W's timely appeal.

## II. STANDARD OF REVIEW

We review a district court's decision that an IEP was or was not appropriate, a mixed question of law and fact, de novo. Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 808 (5th Cir. 2003). "The party contesting the propriety of the IEP bears the burden of establishing why the IEP and the resulting placement are inappropriate under the IDEA." Id. Despite this de novo review, we are mindful that

> Congress left the choice of educational policies and methods where it properly belongs – in the hands of state and local school officials. Our task is not to second guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act.

Flour Bluff Indep. Sch. Dist. v. Katherine M., 91 F.3d 689, 693 (5th Cir. 1996). Underlying fact-findings, "such as findings that a disabled student obtained educational benefits under an IEP, are reviewed for clear error." Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000) (citations omitted).

## III. DISCUSSION

The IDEA was enacted to ensure that students with disabilities were given a free appropriate public education "that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A) (2000). The IDEA requires that the free appropriate public education be tailored to the child's needs by the IEP, which is a written statement

prepared at a meeting attended by a teacher, the child's parents or guardians, and a qualified representative of the school district. 20 U.S.C. § 1414(d)(1)(B) (2000). In Texas, the Admission, Review, and Dismissal Committee is tasked with preparing IEP's for disabled children.

The first question that must be addressed in an IDEA case is whether the school district complied with the procedures of the IDEA. Buser v. Corpus Christi Indep. Sch. Dist., 51 F.3d 490, 492 (5th Cir. 1995). We affirm the district court's finding that the W's "[did] not assert that the procedures of the IDEA were not followed."[8] We therefore move to the second inquiry, whether the IEP was "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 206-207 (1982).

In determining whether an IEP provides a free appropriate public education, we consider four factors: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether positive academic and non-academic benefits are demonstrated. Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 810 (5th Cir. 2003). This Court has also emphasized the importance of the fourth factor by noting that "[c]learly, evidence of an academic benefit militates in favor of a finding that [a student's] IEPs were appropriate." Id.

---

[8]The W's contest this finding. Upon review of the record, nothing in the W's briefing to the district court suggests a valid procedural violation was alleged.

As a final note of caution on determinations under the auspices of the IDEA, we noted in Adam J. that a free appropriate public education "need not be the best one possible, or the one calculated to maximize the child's educational potential; it only has to provide an educational opportunity designed to meet the student's specialized needs, with sufficient support services to allow him to benefit from the instruction." 328 F.3d at 810.

A.    Was the program individualized on the basis of Charles's assessment and performance?

The W's object to Charles's IEP because they believe that it was insufficiently individualized for Charles's needs. They contend that the prescribed intense social skills interventions were handled incorrectly; that Charles's punishments took place at a time too far-removed from the misconduct to be effective; and that he received only "token" gestures in response to his severe environmental sensitivities. In essence, then, the W's are dissatisfied with the implementation of the individualized IEP, not with the lack of an individualized IEP itself. It therefore was not clearly erroneous for the district court to conclude that Charles's IEP was sufficiently individualized.

B.    Was the program administered to Charles in the least restrictive environment?

The W's acknowledge that the large mainstream classes in which Charles was enrolled were appropriate least restrictive environments academically, but challenge the appropriateness of such environments for Charles's behavioral difficulties. The least restrictive environment has been defined in this Circuit as "not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied

peers to the maximum extent possible." Teague Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 128 n.2 (5th Cir. 1993) (emphasis added) (citations omitted). We have previously ruled that an environment was the least restrictive environment when a child "attended his normally assigned school and was mainstreamed with his peers as much as possible." Pace v. Bogalusa City Sch. Bd., 325 F.3d 609, 620 (5th Cir. 2003). Similarly, we noted that an IEP proposed by a school district which would have permitted a child to live at home and attend some regular classes was "obviously less restrictive than the [out-of-state] residential placement" proposed by the parents. Salley v. St. Tammany Parish Sch. Bd., 57 F.3d 458, 467 (5th Cir. 1995). Similarly, Charles was enrolled in mainstream classes to the greatest extent possible, and our jurisprudence suggests that the attendance of regular classes is the least restrictive environment. Thus, it was not clearly erroneous for the district court to rule that Charles's placement within LISD was the least restrictive environment.

C. Were the services for Charles provided in a coordinated and collaborative manner by key "stakeholders"?

The W's essentially concede that efforts to develop an IEP for Charles were coordinated and collaborative. It therefore was not clearly erroneous for the district court to conclude that the W's participated in each stage of the process in a collaborative manner.

D. Were positive academic and non-academic benefits for Charles demonstrated?

The W's base their argument that Charles received no academic benefit from enrollment in LISD on the fact that "a gifted child like Charles should have more than just

passing grades." We can find no support for such an argument in any of our jurisprudence. Instead, we have held that a curriculum withstands a challenge under the IDEA by arguing that it is merely "beneath [the child's] abilities." Adam J. v. Keller Indep. Sch. Dist., 328 F.3d 804, 810 (5th Cir. 2003). In Charles's case, he was enrolled in advanced placement classes in reading and pre-advanced placement classes in math and science at the time of his removal. His grade averages at this time ranged from 77 to 92. He passed all of his classes in the sixth and seventh grades, an accomplishment we have characterized as an "objective indicia of educational benefit." Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 253 (5th Cir. 1997). Charles mastered all the objectives on his sixth grade Texas Assessment of Academic Skills. These facts support the district court's finding that Charles was advancing academically and demonstrate no clear error on the part of the district court.

Further, Charles demonstrated non-academic progress. Although the W's characterize Charles's behavior as substantially worse in seventh grade, they have not established that the district court clearly erred in its analysis of this prong. A new notification process was implemented both for Charles's disability-related offenses and for his non-disability related offenses. Because this process encompassed both types of offenses, the district court could have concluded that a mere increase in the number of notices did not necessarily mean Charles was not progressing in his non-academic achievements. Further, Charles received fewer in-school suspensions from LISD in seventh grade. The W's suggestion that fewer suspensions were a result of LISD's

10

determination that in-school suspensions were ineffective is simply speculation.  Finally, we note that Charles's teachers testified that his behavioral difficulties had improved through his seventh grade year.  The district court's finding that Charles received non-academic benefit from his IEP therefore was not clearly erroneous.

## IV.  CONCLUSION

The W's fail to prove that the district court clearly erred in finding that the IEP was individualized, administered in the least restrictive environment, provided in a coordinated and collaborative manner, and resulted in positive academic and non-academic benefits.  Relying on those findings of fact, we find that LISD's program was reasonably calculated to enable Charles to receive some educational benefit.  As a result, the judgment of the district court is AFFIRMED.