United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 13, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 02-30845

DOUG WHITE, on behalf of Dylan Joseph White; GAIL WHITE,

Plaintiffs-Appellees,

versus

ASCENSION PARISH SCHOOL BOARD; ROBERT CLOUATRE; SUSAN VAUGHN,

Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Louisiana

Before JOLLY, WIENER, and BARKSDALE, Circuit Judges.

RHESA H. BARKSDALE, Circuit Judge:

For this interlocutory appeal from injunctive and other relief awarded parents of a child, pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, primarily at issue is whether, consistent with the IDEA, a school system has the right to select a centralized location for providing services to a hearing-impaired child, notwithstanding the child's parents' request that services be provided instead at his neighborhood school (site-selection issue). The summary judgment and concomitant order granting the injunction and other relief are **VACATED**; judgment is **RENDERED** for Defendants on the site-selection issue; and this matter is **REMANDED**.

Dylan White (Dylan), a hearing-impaired student, identified and qualified under the IDEA as disabled, attends school in Ascension Parish, Louisiana.  Under the IDEA, he is qualified for special education and related services by Ascension Parish Schools (Ascension).  Dylan uses a cochlear implant in one ear and a hearing aid in the other to receive sound input.  He does not require communication assistance outside of the classroom environment, but uses a person — a cued speech transliterator — to assist him in processing spoken information in class.  (A cued speech transliterator does not translate from spoken language to a sign language, but supplements lip-reading and residual or assisted hearing by hand and finger motions to distinguish between elements of speech that would otherwise appear identical.)

Ascension provides a system through which certain services are provided at centralized school sites.  For hearing-impaired students who need cued speech transliterators, Ascension provides those services at three centralized schools (a primary school, a middle school, and a high school).  These centralized schools are regular education campuses, and hearing-impaired students are "mainstreamed" (educated in regular classrooms).  (Deaf students who use American Sign Language attend neighborhood, rather than centralized, schools.)

Dylan attends one of the centralized schools, Gonzales Primary, and has done so since he began attending Ascension schools. It is undisputed that Dylan has achieved substantial academic benefit and success at the centralized school.

In May 2000, when Dylan was in the second grade, the annual, IDEA-required conference for his individualized education program (IEP) was held. Dylan's parents requested his transfer from the centralized school to his neighborhood school, Dutchtown Primary, along with his transliterator (provided by Ascension). Gonzales Primary, the centralized school, is approximately five miles further from Dylan's home than the neighborhood school. Dylan's parents felt that transferring him to his neighborhood school would enhance his social development, including allowing him to attend school with neighborhood children.

Lengthy discussions were held at the IEP conference between the Whites and other IEP committee members regarding the school site selection. Ascension refused the transfer request pursuant to its policy of centralizing the cued speech program and because it believed Dylan was being provided an appropriate education at the centralized school.

The Whites requested an administrative due process hearing. After an evidentiary hearing, including live testimony, the hearing officer addressed whether Ascension "can determine placement for a hearing impaired child excluding parental input" and ruled in favor

of Ascension.  The Whites appealed the decision to a three-judge administrative panel, which affirmed.

The Whites then filed this action, seeking review of the administrative decision, as well as asserting violations of the IDEA, 20 U.S.C. § 1400 *et seq.*; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act (Section 504), 29 U.S.C. § 794; 42 U.S.C. § 1983; and various state laws.

The parties stipulated that the dispute was essentially a legal issue and filed cross motions for summary judgment.  Under the stipulation, the *only issue* was whether the School Board has the right to select the school that a student shall attend.

In March 2002, after oral argument, the district court granted summary judgment in favor of the Whites; it subsequently entered a declaratory judgment and injunction ordering, *inter alia*, that Dylan be assigned to his neighborhood school, along with his transliterator.  Other claims remain pending in district court.

## II.

For this 28 U.S.C. § 1292(a)(1) interlocutory appeal from the injunctive relief, Ascension insists it fully complied with the IDEA.  The Whites respond that the Act was violated because:  they were not allowed input into the site determination; and, in any event, the IDEA contemplates neighborhood school site selection. They also maintain that Dylan's placement at the centralized school violates state law.

4

As noted, the injunction was rendered pursuant to a summary judgment. Such judgments are reviewed *de novo*. *E.g., **Amburgey v. Corhart Refractories Corp., Inc.***, 936 F.2d 805, 809 (5th Cir. 1991). A summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law'". *Id*. (quoting FED. R. CIV. P. 56(c)).

Our role under the IDEA is purposefully limited.

> Congress left the choice of educational policies and methods where it properly belongs — in the hands of state and local school officials. Our task is not to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act.

***Flour Bluff Indep. Sch. Dist. v. Katherine M.***, 91 F.3d 689, 693 (5th Cir. 1996) (quotation omitted), *cert. denied,* 117 U.S. 948 (1997). Moreover, the IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it. *E.g.*, ***Teague Indep. Sch. Dist. v. Todd L.***, 999 F.2d 127, 132 (5th Cir. 1993).

The Whites frame the issue as whether, under the IDEA and state law, the school board may, *at its sole discretion,* reject placement in the school the child would attend if not disabled and the school closest to the student's home (the neighborhood school)

5

*without parental involvement* in that decision and where the IEP can be feasibly and appropriately implemented there. However, the school district did not stipulate (at least in district court) that *no* parental input was allowed on the issue of school selection. (In the administrative hearing, however, the issue was framed as: "Whether [Ascension] can determine placement for a hearing impaired child *excluding parental input*". (Emphasis added.)) Nor does such a stipulation fit the evidence: Dylan's mother testified before the hearing officer that, "[d]uring the IEP meeting[,] we discussed at length [Dylan's] going to Dutch Town [the neighborhood school] and why this had to continue for him to be at Gonzales Primary [the centralized school]".

The Whites, in essence, ask us to do one of two things: (1) render an advisory opinion based on a situation that is not before us (parents not given opportunity to offer any input concerning school selection); or (2) as the district court apparently did, equate giving input with dictating the outcome. Of course, we cannot render advisory opinions. Moreover, as discussed *infra*, we reject the assertion that parents are denied input into a decision *if* their position is not adopted.

Although Ascension and the Whites dispute whether there was "input", there is no genuine issue of material fact. Indeed, the parties do not dispute any facts, but instead dispute what constitutes the requisite parental input under the IDEA. Thus,

6

based upon the input described by Mrs. White (discussions at the IEP meeting), we will address the question that is before us in this case: whether the school district violated the IDEA in assigning Dylan to a centralized school, notwithstanding his parents' request that he be assigned to his neighborhood school.

A.

Ascension first asserts that the IDEA was not violated. The IDEA governs the rights and responsibilities of students who are qualified as disabled under the provisions of the Act. It requires that States provide disabled children with a "free appropriate public education" (FAPE). *See* 20 U.S.C. § 1412(a)(1). The cornerstone of the IDEA is the IEP, which is produced by a team that includes: the child's parents or guardian; a qualified representative of the local education agency who is knowledgeable about, *inter alia*, the resources of the school district; a regular education teacher of the child; a special education teacher of the child; other individuals at the discretion of the agency or the parent; and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). The written IEP specifies the program of benefits to which the student is entitled in order to receive a FAPE. Once a child's educational program is determined, the school must attempt to place the child in the "least restrictive environment" (LRE) (*e.g.,* as best it can, it must educate the child among not

7

disabled children).  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.500-300.556.

When an action is brought under the IDEA, or the appropriateness of an IEP challenged, our inquiry is two-fold:  (1) whether "the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits"; and (2) whether the school district has "complied with the procedures set forth in the [IDEA]".  **Board of Educ. v. Rowley**, 458 U.S. 176, 206-07 (1982).  "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  **Id**. at 207.

1.

Of course, a primary purpose of the IDEA is to ensure that disabled children receive a FAPE.  *See* 20 U.S.C. § 1412(a).  A school satisfies that requirement

> by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.  Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP.  In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and ... should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

**Rowley**, 458 U.S. at 203-04.  A FAPE need not maximize the child's potential; it must guarantee "a basic floor of opportunity".

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (quotation omitted).

Under this prong of *Rowley*, the focus of our inquiry is on academic achievement; and, while the IDEA requires the school to provide services to allow the child the requisite basic floor of opportunity, it does not require the school to make special accommodations at the parent's request (no matter how well intentioned), particularly where the request is not related to helping the child achieve *academic* potential. As noted, it is undisputed that Dylan was succeeding academically at the centralized school; thus, his IEP clearly met the requirements of FAPE. It is also undisputed that the parents' request that Dylan attend his neighborhood school was primarily social — they wanted him to be able to attend school with other neighborhood children; this concern is beyond the scope of the "educational benefit" inquiry courts make under the IDEA.

### 2.

Regarding whether the IDEA's procedural requirements were followed, as stated, the Whites first assert that they were improperly denied input into the site selection. They also maintain the decision otherwise contravened the IDEA.

### a.

As noted, the IDEA requires that the parents be part of the team that creates the IEP and determines the educational placement

of the child, 20 U.S.C. § 1414(d)(1)(B); and the IEP is to include location, 20 U.S.C. § 1414(d)(1)(A)(vi) (IEP must include the projected date for the beginning of services and their anticipated frequency, location, and duration). Additionally, 20 U.S.C. § 1414(f) requires the local education agency to ensure that the parents are members of any group that makes decisions on educational placement.

These statutory provisions do not, however, explicitly require parental participation in site selection. "Educational placement", as used in the IDEA, means educational program — not the particular institution where that program is implemented. *E.g., Sherri A.D. v. Kirby*, 975 F.2d 193 (5th Cir. 1992) ("educational placement" not a place, but a program of services); *Weil v. Board of Elem. & Secondary Educ.*, 931 F.2d 1069 (5th Cir. 1991) (transfer of child to another school was not a change in "educational placement"). Thus, contrary to the Whites' position, that parents must be involved in determining "educational placement" does not necessarily mean they must be involved in site selection. Moreover, that the parents are part of the IEP team and that the IEP must include location is not dispositive. The provision that requires the IEP to specify the location is primarily administrative; it requires the IEP to include such technical details as the projected date for the beginning of services, their

10

anticipated frequency, and their duration. *See* 20 U.S.C. § 1414(d)(1)(A)(vi).

The Whites also rely on the IDEA's implementing regulations. 34 C.F.R. § 300.552 provides:

> In determining the educational placement of a child with a disability ... each public agency shall ensure that —
>
> (a)  The placement decision —
>
> (1)  Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and
>
> (2)  Is made in conformity with the LRE provisions...
>
> (b)  The child's placement —
>
> (1)  Is determined at least annually;
>
> (2)  Is based on the child's IEP; and
>
> (3)  Is as close as possible to the child's home;
>
> (c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled....

The Whites note that "placement" in 34 C.F.R. § 300.552 appears to have a broader meaning than just educational program (thus, the requirement that "placement" be based on the IEP, which contains the educational program, along with other requirements) and to relate in some way to location (thus, the reference to distance from the child's home). Ascension responds that "placement" does

11

not mean a particular school, but means a setting (such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction). It cites 34 C.F.R. § 300.551, which describes "placement" options as such. This is the better view.

In any event, even assuming *arguendo* that the regulations contemplate a parental right to provide input into the location of services, the facts are undisputed that the Whites did so as part of the IEP team that discussed location at length and that ultimately selected the centralized site. To accept the Whites' view of "input" would grant parents a veto power over IEP teams' site selection decisions. Congress could have included that power in the IDEA; it did *not* do so. The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such. *See, e.g., **Blackmon v. Springfield R-XII Sch. Dist.***, 198 F.3d 648, 656 (8th Cir. 1999) (where no "serious hamper[ing]" of parent's opportunity to participate in the formulation process, IDEA requirement of meaningful parental input satisfied notwithstanding that parent's desired program not selected); ***Lachman v. Illinois St. Bd. of Educ***., 852 F.2d 290, 297 (7th Cir.) ("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child".), *cert. denied*, 488 U.S.

12

925 (1988). Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the Whites' input, Ascension met IDEA requirements with respect to parental input. In short, on this record, Ascension complied with this procedural component.

b.

The question then becomes whether Ascension was otherwise required by the IDEA to defer to the Whites' wishes that their son be transferred, along with his support services, to the neighborhood school. The Whites point to two main provisions that they contend support neighborhood school selection: (1) the child's placement is determined at least annually, is based on the child's IEP, and *is as close as possible to the child's home*, 34 C.F.R. § 300.552(b) (emphasis added); and (2) unless the IEP requires some other arrangement, the child is educated in the school that he or she would attend if not disabled, 34 C.F.R. § 300.552(c).

Regarding these provisions, their qualifying language is critical. 34 C.F.R. § 300.552(b) only requires that the student be educated as close *as possible* to the child's home. 34 C.F.R. § 300.552(c) specifies that the child is educated in the school he would attend if not disabled *unless the IEP requires some other arrangement*. Here, it was not possible for Dylan to be placed in his neighborhood school because the services he required are

13

provided only at the centralized location, and his IEP thus requires another arrangement.

Of course, as the Whites point out, neighborhood placement is not possible and the IEP requires another arrangement only because Ascension has elected to provide services at a centralized location. This is a permissible policy choice under the IDEA. Schools have significant authority to determine the school site for providing IDEA services.

> State agencies are afforded much discretion in determining which school a student is to attend ... The regulations, not the statute, provide only that the child be educated "as close as possible to the child's home." However, this is merely *one of many factors* for the district to take into account in determining the student's proper placement. *It must be emphasized that the proximity preference or factor is not a presumption that a disabled student attend his or her neighborhood school.*

*Flour Bluff*, 91 F.3d at 693-94 (emphasis added). In *Flour Bluff*, a deaf child's parents objected to her attending a centralized program rather than her neighborhood school. Our court held in favor of the school:

> IDEA expressly authorizes school districts to utilize regional day schools such as the one at issue here, and we think the importance of these regional programs is obvious. Undoubtedly there are a limited number of interpreters, speech pathologists with backgrounds in deaf education, and deaf education teachers; and by allocating these limited resources to regional programs, the state is better able to provide for its disabled children. Additionally, by placing

14

> these educators at regional centers, those centers are better able to provide further training for those educators and make substitutions for absent educators.

*Id.* at 694 (citations omitted).

All of our sister circuits that have addressed the issue agree that, for provision of services to an IDEA student, a school system may designate a school other than a neighborhood school. Restated, no federal appellate court has recognized a right to a neighborhood school assignment under the IDEA. *See, e.g., **McLaughlin v. Holt Public Sch. Bd. of Educ.**, 320 F.3d 663, 672 (6th Cir. 2003) (LRE provisions and regulations do not mandate placement in neighborhood school); **Kevin G. by Robert G. v. Cranston Sch. Comm.**, 130 F.3d 481, 482 (1st Cir. 1997) ("[W]hile it may be preferable for Kevin G. to attend a school located minutes from his home, placement [where full-time nurse located] satisfies [the IDEA].... The school district has an obligation to provide a school placement which includes a nurse on duty full time, but it is not required to change the district's placement of nurses when, as in this case, care is readily available at another easily accessible school".); **Hudson v. Bloomfield Hills Public Sch.**, 108 F.3d 112 (6th Cir. 1997) (IDEA does not require placement in neighborhood school); **Urban v. Jefferson County Sch. Dist. R-1**, 89 F.3d 720, 727 (10th Cir. 1996) (IDEA does not give student a right to placement at a neighborhood school); **Murray v. Montrose County Sch. Dist.**, 51 F.3d

921, 928-29 (10th Cir.) (no presumption in IDEA that child must attend neighborhood school — proximity to home only one factor), *cert. denied*, 516 U.S. 909 (1995); **Schuldt ex. rel. Schuldt v. Mankato Indep. Sch. Dist. No. 77**, 937 F.2d 1357, 1361-63 (8th Cir. 1991) (school may place student in non-neighborhood school rather than require physical modification of the neighborhood school to accommodate the child's disability); **Barnett v. Fairfax County Sch. Bd.**, 927 F.2d 146 (4th Cir.) (school district complied with IDEA by providing deaf student with "cued speech" program in a centralized school approximately five miles farther than neighborhood school), *cert. denied*, 502 U.S. 859 (1991); **Wilson v. Marana Unified Sch. Dist. of Pima County**, 735 F.2d 1178 (9th Cir. 1984) (school district may assign child to school 30 minutes away because teacher certified in child's disability was assigned there, rather than move the service to the neighborhood school).

Administrative agency interpretations of the regulations confirm that the school has significant authority to select the school site, as long as it is educationally appropriate. The Office of Special Education Programs (OSEP), the Department of Education branch charged with monitoring and enforcing the IDEA and its implementing regulations, has explained:

> [I]f a public agency ... has two or more equally appropriate locations that meet the child's special education and related services needs, the assignment of a particular school ... may be an administrative determination,

16

> provided that the determination is consistent with the placement team's decision.

*Letter from Office of Special Education Programs to Paul Veazey* (26 Nov. 2001). *See also, e.g.*, *Letter to Anonymous*, 21 IDELR 674 (OSEP 1994) (it is permissible for a student with a disability to be transferred to a school other than the school closest to home if the transfer school continues to be appropriate to meet the individual needs of the student); *Letter to Fisher,* 21 IDELR 992 (OSEP 1994) (citing policy letter indicating that assignment of a particular location is an administrative decision).

The Whites insist that 1997 amendments to the IDEA enlarged parents' role. Nevertheless, the amendments do not state — and the Whites do not cite any post-amendment authority for the proposition — that parents may alter a school's good faith policy decision regarding site selection. Moreover, the 2001 OSEP letter (interpreting the current version of the IDEA) is contrary to the Whites' position.

The Whites also urge that there is simply no reason the transliterator cannot move to Dylan's neighborhood school, because she provides services only for Dylan. Again, our task is not to question educational policy decisions; rather, it is to determine whether state and local officials have complied with the IDEA. This principle is unquestionably applicable here:

> Whether a particular service or method can feasibly be provided in a specific special education setting is an administrative

17

> determination that state and local school officials are far better qualified and situated than are we to make.

**Barnett**, 927 F.2d at 152.

Regardless, Ascension has proffered numerous, sound reasons for its centralization policy, including: (1) ability to cover absences and scheduling difficulties; (2) training and staff development; (3) effective use of limited resources; and (4) educational and social advantages. Concerning Dylan's placement, it notes: (1) while Dylan is the only student now served by the transliterator, another student needing to share the transliterator could move into the district; and (2) making an exception to the centralization policy for Dylan would not be fair to other students who share transliterators and must attend the centralized school.

## B.

Ascension also disputes that Louisiana law requires the school to place Dylan in his neighborhood school. The Whites point to provisions similar to those contained in the IDEA and its regulations, especially: (1) LA. REV. STAT. § 17:1944(B)(14), add. 4, which requires "placement" of disabled children in the school nearest their place of residence, *if placement is appropriate*; (2) LA. REV. STAT. 17:1952(C), which requires that a recommendation by a parent as to educational placement be considered equally with any other factors; and (3) LRE provisions that dictate placement in the school the child would attend if not disabled unless the IEP

18

requires another arrangement and, if not in that school, as close as possible to the student's home, Louisiana Department of Education, Bulletin 1706A § 446(B)(3)(a).

Again, the Whites conflate site selection and educational placement. Bulletin 1706A defines placement alternatives as regular classes, special classes, special schools, etc. Bulletin 1706A § 446 (A)(4). Moreover, the IEP Handbook in Louisiana clarifies that "the IEP committee must participate in decisions made about the placement; however, the school system has the right to select the actual school site in view of committee decisions". Louisiana Department of Education, Bulletin 1530 at 9. *See also id*. at 32 (school system has responsibility of determining school site). In addition, the IEP form reserves the right of the local education agency to fill in site determination, stating that this provision must be completed by the school representative and forwarded to the parents within ten days if not specified at the IEP meeting. For this issue, Ascension has not violated state law.

### III.

In sum, neither the IDEA nor state law prevents Ascension from selecting the centralized school site for the implementation of Dylan's IEP, notwithstanding parental input to the contrary. For the foregoing reasons, the summary judgment in favor of the Whites and the concomitant order granting the injunction and other relief are **VACATED**; judgment is **RENDERED** for Defendants on the site-

19

selection issue; and this matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

**VACATED; RENDERED; and REMANDED**