In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-3195

CASEY K. by NORMAN K. and MARI K.,

*Plaintiffs/Counterdefendants-Appellees,*

*v.*

ST. ANNE COMMUNITY HIGH SCHOOL
 DISTRICT NO. 302,

*Defendant/Counterplaintiff-Appellant.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 2128—**Joe Billy McDade**, *Judge.*

_____

ARGUED DECEMBER 8, 2004—DECIDED MARCH 8, 2005

_____

Before FLAUM, *Chief Judge*, and POSNER and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal by an Illinois school district presents a novel issue concerning the scope of the "stay put" provision of the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(j). The Act requires states such as Illinois that accept federal funding for the education of disabled children to provide them with a "free appropriate public education that emphasizes special education and related services designed to meet their

unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A); see *id.*, § 1412(a); 34 C.F.R. § 104.33(a); *Alex R. ex rel. Beth R. v. Forrestville Valley Community Unit School Dist. #221*, 375 F.3d 603, 611 (7th Cir. 2004); *Missouri Dept. of Elementary & Secondary Education v. Springfield R-12 School Dist.*, 358 F.3d 992, 998-99 (8th Cir. 2004). The particulars of the child's program are required to be set forth in an "Individualized Education Program" devised by school officials in collaboration with the child's parents. 20 U.S.C. § 1414(d). Hearing officers resolve disputes regarding the IEP or its implementation. § 1415(f).

Casey K. was a student in the eighth grade of the St. Anne Elementary School, a public school in St. Anne, Illinois. He was and is severely dyslexic. His parents thought that the school could not provide him with the educational services to which the IDEA entitled him, and after enrolling him in a "therapeutic" private school, the Acacia Academy, sought a hearing pursuant to the IDEA to prove their contention and make the school district pay for the cost of the private school. The parties settled their dispute on March 4, 2004, agreeing that Casey could remain in the Acacia Academy at the expense of the school district until May 12, at which time, under Illinois law, having reached the age of 15 he would become the responsibility of the St. Anne Community High School District No. 302. 105 ILCS 5/14-6.01; *Board of Education of Community Unit School Dist. No. 428 v. Board of Education*, 680 N.E.2d 450, 452 (Ill. App. 1997). For although the elementary school and the high school are only three blocks apart, they are each their own, separate school districts (the elementary school is the St. Anne Elementary School District No. 256), and thus each is a distinct "legal entity," with its own school board. 105 ILCS 5/10-10; see *Mueller ex rel. Math v. Community Consolidated School*

*Dist. 54*, 678 N.E.2d 660, 665 (Ill. App. 1997); *Board of Education v. Regional Board of School Trustees*, 460 N.E.2d 100, 105 (Ill. App. 1984); *People ex rel. Smail v. Board of Education*, 99 N.E.2d 385, 387-88 (Ill. App. 1951).

Under the settlement agreement, the IEP that the elementary school district had devised for Casey was to expire when he became the responsibility of the high school district. May 12, Casey's fifteenth birthday, arrived, and a few days later the high school district issued an IEP for him, as it was authorized by state law to do because it was a different district from the district of the school from which he was transferring. 23 Ill. Admin. Code § 226.50(h)(1). The new IEP did not authorize Casey's continued enrollment in the Acacia Academy at the school district's expense. The parents challenged this determination and sought a hearing, as they had before, at which they demanded that until the challenge was resolved, Casey must be allowed to remain in the Acacia Academy at the high school district's expense, pursuant to the stay-put provision. That provision states that while proceedings to enforce rights under the Act are pending, "the child shall remain in [his or her] then-current educational placement" at the expense of whatever public entity issued the IEP that is being challenged, 20 U.S.C. § 1415(j); 105 ILCS 5/14-8.02a(*l*); *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002); *Mackey ex rel. Thomas M. v. Board of Education*, 386 F.3d 158, 160-61 (2d Cir. 2004); *AW ex rel. Wilson v. Fairfax County School Board*, 372 F.3d 674, 679 (4th Cir. 2004), which in this case is the high school district.

It is an open question whether, even if the parents lose their challenge, they must reimburse the public entity for the expense of the private-school placement to which the child, it turns out, was not entitled. *St. Tammany Parish School Board v. Louisiana*, 142 F.3d 776, 788-89 (5th Cir. 1998).

The Act doesn't say; doubtless the draftsmen had in mind that the stay-put provision would be invoked to keep the child in his current public school (the preferred placement, as we'll see) rather than in a private school, although there is no doubt that the state must pay for the private school if the state's own schools don't have a program to which the Act entitles a disabled child, and a private school does. 20 U.S.C. §§ 1412(a)(10)(B)(i), (C)(ii); *School Committee v. Department of Education*, 471 U.S. 359, 369-70 (1985); *Loren F. ex rel. Fisher v. Atlanta Independent School System*, 349 F.3d 1309, 1312 (11th Cir. 2003). The argument for giving the parents a free ride is that otherwise they might be timid about trying to enforce their statutory right to a free private education in an appropriate case. The educational services required by the Individuals with Disabilities Education Act are often very costly—and when provided by a public school, far beyond the means of the average public school parent. The risk of an adverse decision by a hearing officer that would require reimbursement of the private school's charges would deter many parents from enrolling their child in a private school unless they were certain of their right to do so.

The stay-put provision has been interpreted as imposing an automatic statutory injunction, *Honig v. Doe*, 484 U.S. 305, 326-27 (1988); *Rodiriecus L. v. Waukegan School Dist. No. 60*, 90 F.3d 249, 253 (7th Cir. 1996); *John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 556 (3d Cir. 2003), like the automatic stay in bankruptcy. The effect of this interpretation is to make violation of the stay-put provision punishable by contempt, but it is also, as we shall see, to enable the district judge to exercise equitable discretion with respect to the duration of the stay. The district judge refused to lift the injunction (as we may call the stay), precipitating this appeal by the high school

district. The district argues that if the automatic stay requires a school district other than the one responsible for the child's current placement to pay for the continuation of that placement while the parents are challenging the district's IEP, "receiving districts [will] be required to fund private school placements all over the state *and country* for as long as the parents continue[ ] challenging the placement decisions of the new school district" (emphasis added).

The district concedes that if both the elementary school and the high school were in the same school district, Casey would be entitled to "stay put" in Acacia Academy, the placement designated in the elementary school's IEP for him. Otherwise eighth graders wouldn't enjoy the protection of the stay-put provision at all, or tenth graders in a junior high school that ends in tenth grade even if, when they left elementary school for junior high school, or junior high school for (senior) high school, they remained in the same building. It's not as if the break between eighth and ninth grade, or between tenth and eleventh grade, is so much sharper than any other grade break as to make temporary continuation of the previous educational placement inappropriate.

We cannot see what difference it makes if a state decides that the elementary school and the high school serving the same pool of kids shall be deemed to constitute separate school districts. Whatever motivates such decisions (probably they are relics of a time when kids were required to attend school only through the eighth grade) has nothing to do with the purpose behind the stay-put provision. We are told that Illinois once had 950 school districts; were it to reinstate that number, the effects on the stay-put provision would be profound. We cannot see why such a decision

should affect the rights created by a federal statute, or why Congress would have countenanced a state's diminishing those rights simply by designating every public school a separate school district. IDEA is a program of financial assistance to *states* conditioned on the *states'* complying with certain requirements of the Act, such as paying for the private education of disabled children in some instances. From the Act's standpoint the state is an indivisible unit. It must not be allowed to crawl out from under the Act's requirements—while retaining the federal money that it gets in exchange for submitting itself to those requirements—by multiplying the number of its school districts. It would make no sense if, simply by dividing all its school districts in half and thus doubling their number, a state could reduce the expense to it of compliance with the conditions in IDEA without surrendering a penny of IDEA funds.

It is entirely understandable that the St. Anne high school should not want to fund the elementary school's settlement with Casey's parents, which is, in effect, what the stay-put provision is compelling it to do. The settlement was attractive to the elementary school because it required the school to pay for only nine weeks of Casey's stay at the Acacia Academy. It is arguable that before Casey should be allowed to remain in a private school at public expense, either the high school or a hearing officer should decide whether the public school can provide adequate services to the child. Expense is not the only issue; placing a child in a school for disabled children runs contrary to the policy of the IDEA of "mainstreaming" disabled children to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A); see *Honig v. Doe, supra*, 484 U.S. at 311; *Board of Education v. Rowley*, 458 U.S. 176, 202-03 (1982). The "removal of children with disabilities from the regular educational environ-

ment occurs *only* when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (emphasis added). The placement decision must be made in conformity with this statutory "least restrictive environment" requirement and must ensure that "the child is educated in the school that he or she would attend if nondisabled" unless the child's educational program "requires some other arrangement." 34 C.F.R. §§ 300.552(a)(2), (c). Sometimes it does require that; but it can be argued that the step was taken too lightly here in what amounted to a litigation settlement between an elementary school that would shortly have no further responsibility for the child and the child's parents.

That, however, is an issue for another day; it is not argued by the high school district. The district does complain about the settlement, but only because it was not a party to it. It does not argue that a settlement agreement cannot create a current educational placement; quite the contrary, it assumes that the settlement agreement created a valid placement for Casey in the Acacia Academy so long as he was under the jurisdiction of the elementary school district. The high school district's *entire* legal argument for reversal, so far as we can discern, pivots on the fact that the state has placed the elementary school and the high school in separate districts. If they constituted a single district, the high school would be a party to the settlement agreement.

We add that as far as expense (as distinct from what is best for the child) is concerned, nothing compels the State of Illinois to allow the elementary school to shift the cost of Casey's continued stay at the Academy to the high school district. The state can allocate financial responsibilities

among school districts as it pleases, so far as the IDEA is concerned. Each state has plenary authority over its public schools and can make appropriate arrangements for cost sharing across district lines if a child transfers to another district and his parents challenge the new district's Individual Educational Placement. There is no collision between state and federal interests.

The question presented by the state's curious districting is novel, as we said, and the only previous case the parties or we have been able to find that might seem to bear directly on it is *Johnson ex rel. Johnson v. Special Education Hearing Office*, 287 F.3d 1176 (9th Cir. 2002) (per curiam). The school district reads the *Johnson* opinion hopefully to mean that when a child moves across district lines the stay-put provision no longer requires that the child receive exactly the services he was previously getting. For the court in *Johnson* said that a disabled child is only entitled to a "comparable educational placement." But the "comparable" placement in that case involved the identical curriculum and the identical tutors and thus, as the court emphasized, was functionally identical to the child's prior placement, while the allegedly "comparable" placement that our district proposes would take Casey out of his private school and into a public school with completely different teachers, curriculum, and classmates. It was thus only in the most technical sense that by allowing the new district to call the tune the court in *Johnson* was dissolving the automatic injunction—and the court certainly nowhere said or suggested that it thought the injunction had *automatically* lapsed just because the child had left the district. See also *Ms. S. ex rel. G. v. Vashon Island School Dist.*, 337 F.3d 1115, 1133-34 (9th Cir. 2003). There is some questionable language in *Johnson* that could be read to suggest that the automatic injunction isn't really automatic—it is—though

what is true is that the automatic injunction can be dissolved for a compelling reason. *Id*. at 1180; see also *Honig v. Doe*, *supra*, 484 U.S. at 325-28; *Board of Education of Oak Park & River Forest High School Dist. 200 v. Illinois State Board of Education*, 79 F.3d 654, 660 (7th Cir. 1996); *Light v. Parkway C-2 School Dist.*, 41 F.3d 1223, 1227-28 (8th Cir. 1994). But the fact that the old school and the new, though only blocks apart, are separated by a district line is not a good reason, let alone a compelling one, and no other has been offered.

The district warns us that if we affirm, Casey's parents will be able to move him to Alaska and force the public school district in which they settle to pay for Casey's continued enrollment in the Acacia Academy while they challenge whatever IEP the Alaska district devises for the child. There is no way in which Alaska could limit the largesse of an Illinois elementary school, which might agree to a very generous settlement indeed if it thought the child about to move to another state. But here is where the courts' treatment of the stay-put provision as an injunction has bite. If the schools were in different states (perhaps even if they were in different areas of the same state, though that we needn't try to decide), and if as a result the refusal to lift the automatic injunction would impose an unreasonable burden on the transferee school, the district court could exercise its equitable discretion to modify or dissolve the injunction. That is not the case here.

AFFIRMED.

SYKES, *Circuit Judge,* dissenting. I respectfully dissent. Acacia Academy was not Casey K.'s "then-current educational placement" for purposes of the "stay-put" provision of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(j).

As the court notes, the IDEA requires states that accept federal funding for the education of disabled children to provide them with a "free appropriate public education," the specific components of which are established in the child's Individualized Education Program (IEP), which is reevaluated at least annually. 20 U.S.C. §§ 1400(d)(1)(A) and 1414(d). A child's IEP assesses his educational needs, identifies achievement goals, and specifies the special education and related services to be provided in furtherance of those goals. *Id.* The Act calls for a collaborative process between parents, teachers, and special education administrators in the development of a disabled child's IEP and the determination of his educational placement. 20 U.S.C. § 1414(d). The Act requires states to establish an impartial administrative hearing process for the resolution of parental complaints, guarantees certain minimum procedural safeguards, and provides for judicial review. 20 U.S.C. § 1415(a)-(i). The so-called "stay-put" provision, at issue here, provides that during the pendency of administrative and judicial proceedings conducted pursuant to the Act, "the child shall remain in the then-current educational placement of such child." 20 U.S.C. § 1415(j).

The IDEA does not define the term "educational placement." As a general matter, " 'educational placement,' as used in the IDEA, means educational program—not the particular institution where that program is implemented." *White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379 (5th Cir. 2003). The IDEA's implementing regulations require that the

"placement decision" be made by a "group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.552(a)(1). The child's placement "is based upon the child's IEP," 34 C.F.R. § 300.552(b)(2), and the "IEP Team" must consider the unique strengths and needs of the child and the options available for his education. 20 U.S.C. §§ 1414(d)(1)(A), (B); 20 U.S.C. §§ 1414(d)(2), (3).

This circuit has adopted a contextual approach to determining a child's educational placement for purposes of the stay-put obligation. *Bd. of Educ. of Cmty. High Sch. Dist. No. 218 v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548-49 (7th Cir. 1996). We said in *Illinois State Board of Education* that the meaning of the term "educational placement" in the Act's stay-put provision "falls somewhere between the physical school attended by a child and the abstract goals of a child's IEP." *Id.* at 548. Determining the scope of stay-put in individual cases is "something of an inexact science," one that depends upon the context and facts of each case, considered against the purposes of the IDEA. *Id.* at 548-49.

For example, we noted in *Illinois State Board of Education* that in expulsion cases a child's "educational placement" generally means his school, so that "a change of school is interpreted as a change in placement." *Id.* at 549. In the expulsion context, interpreting "educational placement" to mean the child's school of attendance "is in keeping with [the] original purpose of the Education of the Handicapped Act: Congress passed the act to prohibit schools from excluding from the classroom difficult disabled students." *Id.* (citing *Honig v. Doe,* 484 U.S. 305, 309-10 (1988)). On the other hand, "[w]here fiscal concerns cause a student to be transferred, the courts focus not on the

school, but on the child's general educational program. This looser interpretation of placement is appropriate because the concern is not whether the school is attempting to rid itself of a disabled child or that a disabled student has been placed in an inappropriate school." *Id.*

The court's analysis in this case sidesteps a determination of Casey's "then-current educational placement" and overlooks certain core requirements of the IDEA and some important facts underlying Casey's present attendance at Acacia. Educating disabled children outside of public school is strongly disfavored under the IDEA; the Act contains a "mainstreaming" presumption, requiring that disabled children be educated in the least restrictive environment and in school with nondisabled students "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A); *see also Honig,* 484 U.S. at 311; *Board of Education v. Rowley,* 458 U.S. 176, 202-03 (1982). The Act provides that "removal of children with disabilities from the regular educational environment occurs *only* when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* (Emphasis added). The IEP Team's placement decision must be made in conformity with this statutory "least restrictive environment" requirement and must ensure that "the child is educated in the school that he or she would attend if nondisabled" unless the child's educational program "requires some other arrangement." 34 C.F.R. §§ 300.552(a)(2), (c).

Of course, parents are free to reject an IEP and the educational placement offered by their local educational agency (LEA) and enroll their child in the private school of their choice, as Casey's parents did here. But this is at the parents' own expense—at least initially. The IDEA specifically

provides that local educational agencies are *not* required to pay for the education of a child enrolled in private school by his parents without the consent of or referral by the LEA: "This subchapter does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and *the parents elected to place the child in such private school or facility.*" 20 U.S.C. § 1412(a)(10)(C)(I) (Emphasis added). The Act provides for the possibility of *reimbursement* for a unilateral parental private school placement, but only if a "court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to [the unilateral private school] enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). A school district obviously has no stay-put obligation under § 1415(j) to pay for the unilateral parental private school placement until the reimbursement claim is decided in the parents' favor.

Together, these provisions in the IDEA and its implementing regulations operate to establish this predicate for a *private school* "educational placement": there must first be a determination that the LEA either cannot or has not fulfilled its obligation to provide a free appropriate public education to the disabled child in the public school. This determination is made by the LEA itself, through the IEP process (in which case it makes the private school placement), or by a hearing officer or a court, where the LEA and the parents disagree about the appropriateness of the placement proposed by the IEP Team. A unilateral private school placement by a child's parents does *not* become the child's "then-current educational placement" for purposes of stay-put unless and until the LEA acknowledges that mainstreaming in the public school is inappropri-

ate or a hearing officer or court determines that the LEA has failed to timely provide a free appropriate public education.[1]

Neither of these things has occurred here. The administrative process initiated by Casey's parents after they enrolled

---

[1] Thus, the court's reference to "giving the parents a free ride" because "otherwise they might be timid about trying to enforce their statutory right to a free private education" somewhat overstates the matter. *See supra* p. 4. There is no generalized right to a free *private* education under the IDEA. The IDEA guarantees a "free appropriate *public* education"; parents who unilaterally enroll their child in private school have a right to reimbursement of private school costs *if* a hearing officer or court determines that the LEA failed to provide a "free appropriate public education." There is no "free ride" in this situation because the school district has no obligation to pay on a reimbursement claim until it has been adjudicated in the parents' favor. It is a separate question whether parents can be required to "reimburse" a school district that pays on a private school reimbursement claim that has been adjudicated against it by a hearing officer but is later overturned— perhaps not, for the reasons stated by the court. *Id*. But this does not mean that parents have a right to have their unilateral private school decision recognized as a stay-put placement (triggering the school district's obligation to pay) *before* its appropriateness has been adjudicated by a hearing officer. There is no such private school "free ride" under the IDEA. Moreover, the right to private school reimbursement, once adjudicated, does not go on indefinitely, but only while the school district is noncompliant (or acknowledges its inability to comply) with its obligation to provide a "free appropriate public education." *See Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 371-74 (1985); *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 905-06 (7th Cir. 1996).

him at Acacia was aborted by the March 4, 2004, settlement agreement between the parents and the elementary district. As the court notes, because Casey would soon turn fifteen and become the responsibility of the high school district, the elementary district made a prudential litigation decision: it agreed to pay Casey's tuition and transportation costs at Acacia from February 19, 2004, to May 12, 2004, his fifteenth birthday, when responsibility for his education would transfer to the St. Anne Community High School District.

Importantly, however, the elementary district continued to maintain that it could provide a free appropriate public education to Casey at St. Anne Grade School pursuant to the IEP that his parents had rejected—in other words, that Casey could be successfully "mainstreamed." The settlement agreement restated the district's position in this regard and contained the standard nonadmission of any liability or violation of federal or state law. The agreement called for an interim IEP to be developed for Casey at Acacia for purposes of carrying out the terms of the settlement and to comply with the IDEA for the short duration of the agreement but did not purport to effectuate a private "educational placement" for Casey at Acacia. An IEP meeting was convened on March 25; the IEP document reflects that the purpose of the meeting was limited to the "settlement agreement" and establishes an IEP termination date of May 12, 2004, "per agreement between Parents & District." The section of the IEP that would ordinarily contain the IEP team's evaluation of the least restrictive environment for the child's education—which requires an explanation of the team's consideration and rejection of all public school "mainstreaming" options before private school placement is considered—is left blank, except for a notation that placement at Acacia was "as per agreement."

Accordingly, the settlement agreement and the limited term IEP developed in its aftermath did not amount to a private school educational placement under the IDEA for purposes of triggering the stay-put obligation. No hearing officer or court has determined that the elementary district failed to timely provide Casey with a free appropriate public education before Casey's parents enrolled him at Acacia or that private school was appropriate. *See* 20 U.S.C. § 1421(a)(10)(C)(ii). Pursuant to the settlement agreement, Casey's parents withdrew their administrative reimbursement claim against the elementary district; it was never adjudicated on its merits. Nor has the LEA determined that because of the nature and severity of Casey's disability, a free appropriate public education cannot be satisfactorily provided in the regular public school environment. *See* 20 U.S.C. § 1412(a)(5)(A).

The short-term IEP put in place pursuant to the settlement agreement was hardly the result of a bona fide IEP process of the deliberative sort contemplated by the statute and regulations. It was a financial expedient, not a reasoned educational placement decision. There was never any consideration of available placement options or the least restrictive environment for Casey's education; that Casey would be schooled at Acacia was a foregone conclusion given his parents' unilateral decision to place him there. The elementary district consistently maintained that it was willing and able to provide Casey with a free appropriate public education and never conceded that the private school was appropriate as a least restrictive educational placement. *See Mayo v. Balt. City Pub. Schs.,* 40 F. Supp. 2d 331, 334 (D. Md. 1999) ("BCPS agreed to pay Thurston's tuition but did not agree that it was unable to provide a free, appropriate public education to Thurston or that Norbel [a private school] was an appropriate placement for Thurston.").

Thus, Casey's attendance at Acacia remains as it was: a unilateral decision by parents to send their child to private school. It cannot be invoked by Casey's parents as his "then-current educational placement" for purposes of the high school district's stay-put obligation in connection with the present dispute. The elementary district's temporary and conditional acquiescence in the parents' unilateral action cannot constitute an "educational placement" for purposes of the stay-put requirement. The statutory injunction prevents deviation from an educational program arrived at through the intricate and deliberative IEP process while parental challenges to proposed changes in that program are worked out. Here, however, it is the child's parents who altered the status quo: Casey's parents rejected his eighth grade IEP, withdrew him from the public school, enrolled him in private school, and are now seeking to have their unilateral action recognized as an "educational placement" for purposes of the stay-put obligation in connection with their dispute with the high school district. This turns stay-put on its head. *See Monticello Sch. Dist. No. 25 v. George L.,* 102 F.3d 895, 905 (7th Cir. 1996) ("The 'stay put' provision is meant to preserve the status quo during such due process hearings. However, the parents' analysis of that provision would reverse that concept and create a new, permanent 'stay put' for a unilateral [private school] placement.").

The temporary IEP now invoked by Casey's parents for purposes of the stay-put obligation was put in place not by a collaborative educational evaluation but pursuant to a limited financial settlement. "Payment and placement are two different matters." *Zvi D. v. Ambach,* 694 F.2d 904, 908 (2d Cir. 1982). It is unclear to me why such a stop-gap financial compromise should be considered an "educational placement" at all, much less the child's "then-

current educational placement" for purposes of stay-put; the agreement and the interim IEP expired on May 12, 2004. The court's application of the stay-put requirement to this unilateral parental private school enrollment conflicts with the IDEA's explicit preference for mainstreaming, its elaborate IEP process, and its proviso that private school costs need not be reimbursed until certain factual predicates are either admitted or proven to the satisfaction of a hearing officer or a court.

Other courts have held that a unilateral parental private school placement becomes a child's "then-current educational placement" for purposes of the stay-put requirement only *after* there has been an administrative determination that the private school placement is appropriate. *See Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir. 1990); *Zvi D.*, 694 F.2d at 906-07; *see also Mayo*, 40 F. Supp. 2d at 333-34; *Saleh v. District of Columbia*, 660 F. Supp. 212, 215 (D. D.C. 1987). I agree with the decisions of these courts.

It is true that in its argument before this court, the high school district focused primarily on the legal effect of Casey's transfer from the elementary school district to the separate high school district. However, the school district did assert (albeit as a secondary argument and less completely than I have explained here) that Acacia cannot be considered Casey's "then-current educational placement" for purposes of stay-put because it was a unilateral parental private school placement, because it violated the IDEA's "mainstreaming" requirements, and because it was a short-term settlement expedient and not the product of an IEP process that determined its appropriateness. Accordingly, I cannot agree with the court that the school district failed to

argue this issue.[2]

Regarding the legal effect of the interdistrict transfer, I agree with the reasoning of *Johnson v. Special Education Hearing Office*, 287 F.3d 1176, 1181-82 (9th Cir. 2002), that a transfer of responsibility from one distinct educational agency to another has relevance for stay-put analysis.[3]

---

[2] I acknowledge the inconsistency in the high school district's argument, which is noted by the court: the district asserted that Acacia is not Casey's "then-current educational placement" under what it called "traditional stay-put analysis," but also suggested that the elementary school district would have been required to finance Casey's continued education at Acacia under stay-put had Casey remained under the elementary district's jurisdiction.

[3] At issue in *Johnson v. Special Education Hearing Office*, 287 F.3d 1179 (9th Cir. 2002) was the application of the stay-put provision where responsibility for a disabled child's education shifted from one educational agency to another because of the child's age. *Johnson* involved a preschool child who, while under the age of three, received special education services pursuant to a program established and implemented by a regional public educational agency. *Id.* at 1178. When the child turned three, the responsibility for his education transferred from the regional agency to the local school district; the local district developed an IEP that used the same goals, objectives, and services as the child's previous program with most, but not all, the same service providers (the child's tutors were the same, but the local district substituted its own supervisors). *Id.* at 1179-82. The child's parents were dissatisfied and initiated a due process hearing; they also filed a stay-put request with the administrative hearing office asserting entitlement to *exactly* the same service providers as under the regional agency's educational program. The administrative hearing office adopted the local school district's interpretation of the stay-put obligation in

(continued...)

Illinois has promulgated regulations governing interdistrict transfers, which generally require the receiving district to implement the former district's IEP until it develops one of its own. *See* 23 Ill. Adm. Code 226.50(h). However, for the more fundamental reasons discussed above, I conclude that Acacia is not Casey's "then-current educational placement" for purposes of the stay-put obligation under § 1415(j).

---

[3] (...continued)
this situation and issued a stay-put order requiring the district to implement the regional agency's program except that the district "need not utilize the same vendors who provided services under that [program]." *Id.*

   The parents filed for injunctive relief in district court. The district court denied relief and the Ninth Circuit affirmed. *Id.* The court noted that when responsibility for a child's education shifts from one educational agency to another, "the status quo necessarily changes." *Id.* at 1181. The court held that where a disabled child "transitions between educational agencies," the transferee district "can meet the requirements of the 'stay-put' provision by providing [a] comparable educational placement." *Id.* at 1181. The hearing office's stay-put order was consistent with the statute because it "maintained the stability of [the child's] educational program as contemplated by the 'stay-put' provision, while taking into account the reality of a shift in responsible educational agencies." *Id.* at 1182. Because the educational program developed by the local school district was comparable to that which had been provided by the regional agency (only the plan supervisors were different), "the 'stay-put' order correctly determined [the child's] 'then current educational placement'" for purposes of § 1415(j). *Id.* at 1182.

---

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*